JARBOE et al. v. TEMPLER et al.

(*Circuit Court, D. Kansas.* March 18, 1889.)

1. MECHANICS' LIENS — ENFORCEMENT — EQUITY — RELIEF TO SUBSEQUENT LIEN CREDITORS.

Where proceedings to enforce a mechanic's lien are properly removed to the federal court, and a receiver is appointed, and the property sold, and the proceeds are in court for distribution, and a lien creditor, who is made a party, sets up his claim by cross-bill, the court may make a decree establishing his lien, and for a deficiency, under equity rule 92, though the fund is exhausted in paying the costs and the prior lien. It is not necessary that such creditor should resort to an action at law.

2. FEDERAL COURTS — JURISDICTION — DIVERSE CITIZENSHIP — TRANSFER OF CAUSE OF ACTION.

The jurisdiction of the federal courts, which has once attached by reason of diverse citizenship, is not divested by a subsequent transfer of the cause of action by which the controversy becomes one between citizens of the same state.

3. ASSIGNMENT — CONSTRUCTION — PAYMENT — EVIDENCE.

The cashier of a bank was called at midnight to meet a member of a firm indebted to the bank, and was then informed of the failing condition of the firm, and that it desired to save the bank from loss, and took an assignment of certain property for an expressed consideration of double the amount of the debt. The bank took possession, and retained the property until taken from it in judicial proceedings, and continued improvements thereon, which it paid for with money furnished by the partner making the assignment and the firm book-keeper, and collected from persons with whom the firm had dealings. It was alleged that the transfer was in payment, and not as security, and that the partner making the transfer was given individually the right to redeem, and that the subsequent payments were with his money. The account on the bank's books was not closed, and no receipt was given. In a suit against the other partner to recover the debt, *held*, that the transfer was by way of security only.

4. SAME — ASSIGNMENT FOR SECURITY — POWER OF ASSIGNEE.

The bank was not authorized to employ watchmen for the property at the expense of the firm without first obtaining its consent.

In Equity.

Bill by D. M. Jarboe & Co. against T. J. Templer and others, and cross-bill by the Atchison Savings Bank.

*W. W. Guthrie* and *J. D. S. Cook*, for Atchison Savings Bank.

*L. C. Slavens*, for T. J. Templer.

FOSTER, J. This case comes on for hearing upon the cross-bill of the Atchison Savings Bank, and the plea and answer thereto of T. J. Templer. The proceedings leading up to this issue are briefly as follows: In September, 1880, D. M. Jarboe and James Smith, copartners as D. M. Jarboe & Co., citizens of Missouri, commenced their suit in the district court of Atchison county against T. J. Templer and B. F. Johnson, copartners as T. J. Templer & Co., also citizens of Missouri, to enforce a mechanic's lien on elevator property situate in said county. To this suit were made also defendants Richard A. Park, cashier of said savings bank, the Central Branch Union Pacific Railroad Company, and other

citizens of Kansas claiming liens on said property. The railroad company filed a demurrer to the bill, and the other defendants filed answers setting up their several liens. The railroad company then removed the cause to this court on the ground of a separable controversy between it and the said plaintiffs. After the cause had been removed, an order was made, January 8, 1881, that the parties recast their pleadings, and that John S. Kellogg and the Atchison Savings Bank have leave to enter their appearance, and interplead in the cause, and file answer and cross-bill on or before March rule-day. Soon after this order was made, and on January 18th, a receiver was appointed by this court to take charge of said property, who afterwards obtained an order of sale, and sold the property for the sum of $15,000, and held the money subject to the further order of the court. Nothing seems to have been done under the order to recast the pleadings, until April 4th, when John S. Kellogg and the Atchison Savings Bank presented to the court, and had leave to file, with consent of all parties, their respective pleadings. Kellogg, who was a citizen of Kansas, presented what he termed a "supplemental bill," alleging that he had purchased the claim of said complainants D. M. Jarboe & Co., and also the claims of the several defendants, except those of the Atchison Savings Bank and the said railroad company; that the claims so purchased amounted to over $14,000; and alleging that they were a first lien on the said property, and that said bank and railroad company had or claimed to have some lien or interest in said property; and praying that said parties be required to set forth their respective claims; and that said liens be determined, and that the claim of said Kellogg be declared a first lien on said fund then in court. On the same day, by leave of court, and consent of parties, the Atchison Savings Bank filed its cross-bill, making all the other parties defendants thereto, and setting forth that T. J. Templer & Co. were indebted to said bank in the sum of about $10,000 for money loaned and advanced by the bank to said Templer & Co. at various times, and to secure which said Templer & Co. had on the 31st of May, 1880, assigned and transferred to R. A. Park, cashier of said bank, and in trust for the bank, a certain lease of real estate made by said railroad company to said Templer & Co., and upon which real estate the said elevator was constructed, together with all the buildings, machinery, and improvements thereon, and that its claim was a first lien on said property and the fund in court; and praying for a decree, and for judgment against said Templer and Johnson for any balance remaining unpaid, etc. The railroad company withdrew its demurrer, and made no further claim in the cause. The complainants Jarboe & Co., and all the defendants, entered their appearance to Kellogg's bill and the cross-bill of the bank, but made no answer.

The matter of the claims of Kellogg and the savings bank was referred to a special master to take testimony and report the amounts due, and determine the question of priority. In accordance with the master's report, a final decree was made at the June term, 1881, in which it was found there was due Kellogg $14,806.95, and that it was a first lien on the property; and to the savings bank the sum of $10,525.44, which

was a second lien on the property; and ordering, after the payment of all costs, receiver's and master's fees, that the fund be applied to the payment of these respective claims in the order named, and that said parties have judgment over against Templer and Johnson for any balance remaining unpaid. After paying costs there was not sufficient money to pay the Kellogg judgment, and of course nothing was paid on the bank judgment. Several years later, in 1885, the bank commenced proceedings in this court against Templer and Johnson and others in the nature of a creditors' bill, seeking to reach and subject to its judgment certain real estate then held, as charged in the bill, by the wives of said Templer and Johnson, but in reality the property of said defendants, and purchased with their money, etc. To this bill the defendants put in a plea against the validity of the bank's judgment, averring that the court had no jurisdiction of these defendants in that case; that they were not served with process, nor did they enter their appearance therein. On this issue a trial was had, and it was found from the evidence that Johnson, one of the partners, when the suit of Jarboe & Co. had been commenced, employed Mills & Wells, attorneys, to represent the said Templer & Co. in said suit, with authority to enter their appearance, which the said attorneys accordingly did. It further appeared that Johnson had employed the attorneys, and given them authority to enter the appearance of the firm, without express authority of his partner Templer. On this state of facts the court held that there was no jurisdiction of Templer in that case, and that as to him the judgment was void. It was then ordered that said judgment be set aside as to Templer, and that he be allowed to enter his appearance in the cause, and contest the claim of the bank as set out in its cross-bill. (See opinion in 26 Fed. Rep. 580.) He then filed another plea to the jurisdiction on the ground that, inasmuch as there was nothing left of the security or fund in court to be applied on the decree of the bank, that the court could not render a judgment over against Templer and Johnson, but the bank should resort to an action at law. That plea was overruled. The defendant then filed a motion to dismiss the case for want of jurisdiction of the parties, in this, to-wit: John S. Kellogg, who had purchased the claim of the complainants Jarboe & Co., together with those of several defendants, was a citizen of Kansas, and on his filing his supplemental bill it was no longer a controversy between citizens of different states, but became a controversy between him and the railroad company, both citizens of the same state. The defendant also answered to the merits of the cross-bill of the bank, and the testimony has all been taken, and the cause is now submitted.

The defendant again presses his objections to the jurisdiction of the court to render any decree in the cause, and also to render a personal judgment against the defendants. Although the last objection has been before considered and overruled, I will briefly give my views on this question again. The court had acquired jurisdiction by proper proceedings of removal from the state court, which is not questioned. It had taken possession of the property by its receiver, and ordered it sold, and the proceeds were in court. All parties who had any interest in or claims

or liens upon the property were proper and necessary parties to a complete and final adjudication of the matter. The bank was one of the principal claimants. It was properly made a party, and set up its claim by cross-bill, and asked for a decree establishing its lien, and applying the proceeds of the security, and for a judgment over against Templer and Johnson for any balance remaining unpaid. I believe under equity rule 92 it was entitled to such a decree and judgment, and I cannot see that it alters the case that the security fund was exhausted in paying the costs and the prior lien of Kellogg. I can see no reason why the right to a judgment over depends on what price the security may sell for, or the amount of costs paid. Ordinarily the decree and judgment are entered before any knowledge of what amount of money will be realized out of the security, and surely it cannot be that the validity of that judgment depends upon the amount for which the property may afterwards be sold. But if there is, as urged by defendants' counsel, some special potency to the validity of the judgment in the payment of some amount, although it may be but a dollar, out of the security fund, why is not the payment of the costs recovered by and included in the bank judgment sufficient to redeem and save the whole? In my opinion, equity, having jurisdiction of the parties and subject-matter, had the power to make a complete adjudication of the cause without turning the junior lienholders over to a court of law. The following authorities sustain this view: *Hayden* v. *Drury*, 3 Fed. Rep. 782; *Insurance Co.* v. *Tyler*, 8 Biss. 369; *Ober* v. *Gallagher*, 93 U. S. 199.

This brings us to the next question affecting jurisdiction. The separable controversy between Jarboe & Co. and the railroad company, for which the cause had been removed, had become, by Kellogg's purchase of the claim, not another or different controversy, but a controversy in which a different party, and a citizen of the same state with the adverse party, had become the party in interest. Leaving out of consideration the controversy remaining in the case between the bank and Kellogg, citizens of Kansas, on the one side, and the principal debtors, Templer and Johnson, citizens of Missouri, on the other, let us consider whether the transfer of Jarboe's interest to Kellogg ousted the jurisdiction of the court. In *Dunn* v. *Clarke*, 8 Pet. 2, a judgment in ejectment had been recovered by Graham, a citizen of Virginia, against Clarke, a citizen of Ohio. Graham died, and Dunn, a citizen of Ohio, held the land under the will of the deceased. Clarke filed his bill against Dunn in the United States circuit court of Ohio, praying for an injunction against the enforcing of said judgment, and for a decree for the conveyance of the land to complainant. Here both parties were citizens of Ohio, but the court held that Dunn being the representative of Graham, the court had jurisdiction; "that no change in the residence or condition of the parties can take away a jurisdiction once attached." If, however, new parties not privies to the suit were brought in, over whom the court had no jurisdiction, it could proceed no further with the case. In *Clarke* v. *Mathewson*, 12 Pet. 170, Wetmore, a citizen of Connecticut, sued Mathewson, a citizen of Rhode Island, in the last-named state. Wetmore

died pending the litigation, and Clarke, a citizen of Rhode Island, was appointed his administrator. Clarke sought to revive the suit in his name, and the circuit court held it had no jurisdiction, as both plaintiff and defendant were citizens of the same state. The supreme court reversed the decision, and held that Clarke, as the representative of Wetmore, could maintain the suit; that it was not an original proceeding, but a continuation of the original suit. The court say:

"The parties to the original bill were citizens of different states, and the jurisdiction of the court completely attached to the controversy. Having so attached, it could not be divested by any subsequent events, and the court had a rightful authority to proceed to a final determination of it. If after the commencement of the suit the original plaintiff had removed into and become a citizen of Rhode Island, the jurisdiction over the cause would not have been divested by such change of domicile."

This seems to be directly in point on the question in controversy in this case. To the same effect see *Morgan's Heirs* v. *Morgan*, 2 Wheat. 290. "The jurisdiction depends upon the state of things at the time the action was brought, and after it is once vested it cannot be divested by a subsequent change of residence of either of the parties." *Mollan* v. *Torrance*, 9 Wheat. 537 See *Phelps* v. *Oaks*, 117 U. S. 236, 6 Sup. Ct. Rep. 714; *Stewart* v. *Dunham*, 115 U. S. 61, 5 Sup. Ct. Rep. 1163; *Gibson* v. *Bruce*, 108 U. S. 563, 2 Sup. Ct. Rep. 873. In the last-named case the court decide that a state court cannot be deprived of its jurisdiction by change of citizenship after the suit was commenced. If a change of domicile, making both parties citizens of the same state, would not divest jurisdiction, it is useless to argue that a transfer of the subject of litigation, producing the same result, would affect the jurisdiction. The issue between the Jarboe claim and the railroad claim still remained; and parties coming into the suit as privies or representatives of interest already involved, in general take such interest as it then exists, subject to its abilities and disabilities. *Cable* v. *Ellis*, 110 U. S. 389, 4 Sup. Ct. Rep. 85; *Railway Co.* v. *Shirley*, 111 U. S. 358, 4 Sup. Ct. Rep. 472; *Stewart* v. *Dunham, supra; Phelps* v. *Oaks, supra.*

Passing from this question, we come to the merits of the controversy between the parties. The complainant the Atchison Savings Bank, in brief, charges in its cross-bill that it is a corporation organized under the laws of Kansas, and that T. J. Templer and B. F. Johnson were co-partners under the name and firm of T. J. Templer & Co.; that said Templer & Co., in March, 1880, leased a piece of land of the Central Branch Railroad Company for the period of 10 years, and erected a grain elevator thereon; that at various times from March to June of said year the complainant loaned to Templer & Co. different sums of money for the purpose of building said elevator, and other purposes of the firm, amounting in the aggregate to the sum of $8,500; that on the 31st day of May, in order to secure the bank for the money so loaned, Templer & Co. assigned and transferred its said lease, together with all the improvements on the said premises, to R. A. Park, cashier of said bank, in trust for the bank, which assignment reads as follows:

"ATCHISON, KANSAS, May 31, 1880.

"In consideration of sixteen thousand dollars to us in hand paid, we do hereby sell, transfer, and assign to Richard A. Park all our interest, right, and title to the within lease, and all the buildings, fixtures, machinery, lumber, and property of every kind and description contained and upon the lots herein described or belonging or relating to the improvements being erected thereon.　　　　　　　　　　　　　　　T. J. TEMPLER & CO."

Complainant further alleges that there is due it from Templer & Co. the further sum of $1,375.16, for money by it expended after the said transfer in and about the completion of said elevator, and for taxes, insurance, and other expenses connected with the care of the property. The defendant Templer, in his answer, admits the incorporation of the bank, the partnership of Templer and Johnson, the making of the lease with the railroad company, and the assignment thereof to R. A. Park, cashier, and the loan by the bank of $8,500 to Templer & Co.; but he expressly denies that the lease was assigned and transferred to Park, cashier, for the purpose of security for the bank debt, but was transferred and accepted as a complete sale, and in full satisfaction of the debt. He denies that the bank, or Park, cashier, with the consent of Templer & Co., expended money in the completion of the elevator, or for taxes, insurance, or other purposes to the amount of $1,375.16, or any other sum; and denies that he is indebted to the bank in any sum whatever. He goes on further to allege that there was a private agreement between Park and Johnson by which Johnson was individually to have the right to redeem or repurchase for his individual benefit the property by paying the bank debt and 10 per cent. interest.

It will be seen that the main controversy between the parties is concerning the nature, intent, and purpose of the transfer of the lease and elevator property to Park, cashier of the bank; the bank claiming that the transfer was made merely as security for its debt, while the defendant claims it was made as an absolute sale, and was accepted as an absolute payment and extinguishment of the bank's debt. It appears that the debt of Templer & Co. was kept on the books of the bank as an open account. The defendants were permitted to check on the bank for money as they might require it in their business. This money was used by the firm in the business of constructing the elevator, buying machinery and other material for the same, and also in the buying and shipping of grain, etc. On the 31st of May, Templer & Co., being financially involved and about to fail, desired to pay or secure the bank in preference to some other creditors, and for that purpose made the transfer of the lease and elevator property to said Park in trust for the bank. It appears that neither Park nor any other officer of the bank was aware of the failing condition of Templer & Co. until about two or three hours before the transfer was made, and the information came to Park in the following manner: He was called out of his bed on Monday morning, May 31st, between the hours of 12 and 3 o'clock, by Mr. Draper, bookkeeper of Templer & Co., to meet Johnson and Draper at the office of Mills & Wells, Johnson's attorneys. Park was then informed of the

failing condition of Templer & Co., and that they desired to protect and save the bank from loss; and after some consultation among the parties it was determined to make the transfer of the lease. On the same morning Johnson took the lease to St. Louis, and had the transfer approved by Talmage, general superintendent of the railroad company. The bank then took possession of the property, and held it until it went into the hands of the receiver in this case. After the bank took the property, there was further work done on the elevator to complete it, and payments made for machinery and labor, etc. The money for this purpose was furnished or paid to Park by Johnson and Draper, and amounted to several hundred dollars. This money was collected from parties with whom the firm had dealings in grain. The defendant claims it was Johnson's individual money, and was paid under the private agreement with Park before referred to. In the first place, it does not appear that it was Johnson's individual money that was paid after the transfer. The money used in buying grain was money of the firm, at least to some extent, and was charged to the firm on the books of the bank. There is no testimony contradicting the testimony of Draper, the book-keeper, to the effect that the money was used indifferently in constructing the elevator and in buying grain for the firm. He says the money paid by Johnson and himself in and about the property after the transfer, came from the proceeds of the grain business. Again, if there was such a private agreement as claimed by defendant between Park and Johnson, by which Johnson was to derive some personal benefit to himself by redemption of the property of the partnership, it was an agreement he had no legal right to make. It is urged that Park does not deny this agreement in his testimony. Park does say that there was an agreement or understanding that Templer & Co. were to have the property back when they paid the bank debt. Now, how easy to put two meanings to the statement, "You may have this property back when you pay the debt." Such a remark, addressed to Johnson, would fairly imply, not that Johnson individually might redeem the property, but that Templer & Co., the parties making the transfer, might redeem. The court will not presume the parties undertook to make an illegal contract, when the agreement is susceptible of a proper and legal import.

In regard to the intent of the parties in making the transfer of the property, the testimony of the witnesses present at the time is quite evenly divided. Park and Draper testify it was made as security only, while Johnson and Corry testify it was an absolute sale. We are compelled to look to all the circumstances, as well as the testimony of the witnesses, to solve this question. If it was an absolute sale, Templer and Johnson had no further interest in the property, and certainly would spend no more of their money in completing the work. Nor is it altogether probable that Park, on so short a notice, without any opportunity to consult with the other officers of the bank, and without any positive information of the amount of mechanics' or other liens on the property, would have taken the responsibility of buying the property subject to all claims against it, and canceling the debt of the bank. Cashiers of banks

do not usually take such responsibilities, but do usually take prompt measures to obtain security in cases of emergency. No entry was made 'on the books of the bank squaring or closing the account until after the judgment had been obtained. Of course that merged the account in the judgment. No receipt was asked for or taken by Johnson, nor does the assignment itself purport to be made in full satisfaction of the debt. It recites a consideration of $16,000,—a sum almost twice the amount of the bank debt, and which Park testified included $7,500 of a fictitious charge entered against Templer & Co., at Johnson's request, in order to keep other creditors off the property. Under all the testimony and the circumstances surrounding the transaction I can reach no other conclusion than that this transfer was made as security for the bank debt, and not in extinguishment of it.

In reference to the charge of $1,375.16, there are some items in it that may well be questioned. In the absence of any authority from the assignors, the custodian of the property would be limited to such expenses as were proper and necessary in the care and preservation of the property. There was such consent to the completion of the building, paying for labor, material, etc. The custodian was justified in keeping the property insured, and paying the taxes, but in this account are the items of $315 for insurance, and several hundred dollars for watchmen for the property. This being an extraordinary expense, the cashier should have obtained the consent of the owners before making it. With this charge stricken out, the complainant is entitled to a decree and judgment for the amount of its claim, and it is so ordered.